cfur v. puc 



IN THE COURT OF APPEALS, THIRD DISTRICT OF TEXAS,



AT AUSTIN




 





NO. 3-93-071-CV





CITIES FOR FAIR UTILITY RATES


AND THE STATE OF TEXAS,



 
 APPELLANTS


vs.





PUBLIC UTILITY COMMISSION OF TEXAS


AND HOUSTON LIGHTING AND POWER COMPANY,



 APPELLEES



 




FROM THE DISTRICT COURT OF TRAVIS COUNTY, 345TH JUDICIAL DISTRICT



NO. 493,985, HONORABLE W. JEANNE MEURER, JUDGE PRESIDING



 





 Cities for Fair Utility Rates ("Cities"), and the State of Texas (on behalf of various
Texas state agencies) ("the State"), appellants, filed suit in the Travis County District Court
seeking judicial review of an order of the Public Utility Commission (the "Commission")
increasing rates to be charged by Houston Lighting and Power Company ("HL&P"). The rate
increase was sought primarily to account for costs of constructing Unit 2 of the South Texas
Nuclear Project. The Commission had issued its order, after hearing, pursuant to the Public
Utility Regulatory Act, Tex. Rev. Civ. Stat. Ann. art. 1446c (West Supp. 1994) ("PURA"). The
district court affirmed. Cities and the State appeal. Cities challenges three aspects of the
Commission's decision: (1) failure to account for tax savings associated with certain disallowed
expenses; (2) inclusion in rate base of certain upgrade costs; and (3) inclusion in rate base of
certain costs characterized as "plant held for future use." The State challenges the Commission's
granting of deferred-accounting treatment for certain costs relating to Unit 2. We will reverse the
portions of the district court's judgment upholding the Commission's failure to require that certain
tax savings associated with disallowed expenses be passed on to consumers. We will affirm the
remainder of the district court's judgment.


FACTUAL AND PROCEDURAL BACKGROUND


 HL&P provides electric service to approximately 1.3 million customers in a 5,000
square-mile area of the Texas Gulf Coast. On November 23, 1988, HL&P filed an application
for authority to change rates. In its application, HL&P requested an annual revenue increase of
$446,198,000, or 15.5%, over adjusted test-year revenues, based on a test year ending September
30, 1988. HL&P also filed a separate application to reconcile its fuel costs. The two applications
were consolidated on December 20, 1988. On June 9, 1989, during consideration of the
applications, HL&P put bonded rates into effect.

 After lengthy hearings, the hearings examiners issued a report on May 2, 1990, and
a supplemental report on May 15. The Commission adopted the examiners' reports, with some
modifications, in its order of June 20. The Commission's order was amended on rehearing on
September 18, 1990.

 Several parties to the rate case filed suits for judicial review in the Travis County
district court, attacking various findings and conclusions of the Commission. See Administrative
Procedure Act ("APA"), Tex. Gov't Code Ann. § 2001.171 (West 1994). The suits were
consolidated by the district court. The district court affirmed the Commission's order in all
respects. Cities, consisting of the incorporated municipalities of Lake Jackson and Beach City,
and the State have now appealed to this Court.


CITIES' APPEAL


1. Disallowed Expenses

 By its fourth point of error, Cities complains that the rates approved by the
Commission overstated HL&P's federal income tax expense. Cities points to the Commission's
findings of fact reflecting that the Commission did not require HL&P to pass on to ratepayers tax
savings associated with deductions taken for expenses disallowed in cost of service. Cities argues
that the Commission thus erred by including in cost of service greater income tax expense than
was actually incurred.

 In general, a utility is entitled to just and reasonable rates, taking into account
reasonable and prudent operating expenses incurred by the utility. PURA § 39; Public Util.
Comm'n v. Houston Lighting & Power Co., 748 S.W.2d 439, 441 (Tex. 1987), appeal dism'd,
488 U.S. 805 (1988). Exceptions to this general rule are set out in PURA § 41(c)(3), which
provides that certain expenses, such as lobbying, may not be considered by the Commission in
setting rates. Therefore, in order to recover operating expenses through rates, a utility must prove
that its expenses are not disallowed under PURA § 41(c)(3), and that they are reasonable,
necessary, and were actually incurred. Houston Lighting & Power, 748 S.W.2d at 441; see
PURA § 39.

 Federal income tax is an operating expense that a utility may recover through rates. 
Houston Lighting & Power, 748 S.W.2d at 441. In computing federal income tax, a utility may
deduct some of its operating expenses. These deductions may include some of the expenses
included in rates; however, they also may include operating expenses the Commission disallowed
from being recovered in rates. When a utility deducts its expenses for income tax purposes, it
reduces the federal income tax liability it otherwise would have incurred.

 The Commission and HL&P contend that if an expense is disallowed by the
Commission for revenue-requirement purposes, the utility's cost of service should be calculated
as if that expense had not been deducted for income-tax purposes. Such a method of calculation
would eliminate the tax savings associated with the disallowed expenses, thereby increasing the
utility's cost of service and, in turn, its overall revenue requirement. We believe this issue has
been settled adversely to the position taken by the Commission and HL&P. The Texas Supreme
Court, in Houston Lighting & Power, held that tax savings actually enjoyed by a utility should
inure to the benefit of ratepayers. 748 S.W.2d at 442. A utility's rates must reflect the tax
liability actually incurred. Id. In Public Utility Commission v. GTE-SW, 833 S.W.2d 153, 168-69 (Tex. App.Austin 1992, writ granted), we followed Houston Lighting & Power and held that
tax savings resulting from tax deductions taken for disallowed non-capital expenses must be passed
on to customers through the rate calculation. The prohibition against considering certain expenses
for ratemaking purposes is not violated by such a holding because the terms of PURA § 41(c)(3)
forbid only consideration of certain expenses, but say nothing of savings. Id. at 169. In Cities
of Abilene v. Public Utility Commission, 854 S.W.2d 932, 943-45 (Tex. App.Austin 1993, writ
requested), we again followed Houston Lighting & Power and held that tax savings resulting from
deductions of expenses must apply to reduce rates, even if the expense deducted cannot be
included in cost of service. We have continued to follow this rule in the absence of further
supreme court guidance. See Texas Utils. Elec. Co. v. Public Util. Comm'n, No. 3-92-548-CV,
slip op. at 15 (Tex. App.Austin June 15, 1994, n.w.h.); City of Alvin v. Public Util. Comm'n,
876 S.W.2d 346, 359-60 (Tex. App.Austin 1993, writ requested).

 In the instant case, the Commission found that "[t]o incorporate those deductions
for disallowed or below-the-line expenses into the calculation of the utility's income tax expense
would be unfair to [the utility's] shareholders. The shareholders pay the expense; they should
receive the associated deduction." We believe this finding conflicts with Houston Lighting &
Power, GTE-SW, and Cities of Abilene. HL&P's rates must reflect the federal income tax expense
it actually incurred. Tax savings resulting from deductions for operating expenses, even those
expenses otherwise disallowed in cost of service, must be included in the calculation of the
utility's income tax expense and must be passed along for the benefit of ratepayers. Cities' fourth
point of error is sustained.


2. UPGRADES

 W.A. Parish Units 5, 6, and 7 were constructed for HL&P by Brown & Root
during the 1970s. HL&P, in an attempt to comply with air-quality regulations, installed hot-side
electrostatic precipitators ("ESPs"), manufactured by a division of Joy Manufacturing, in the
Parish Units. (1)
 The original price of the ESPs was $28 million.

 The hot-side ESPs did not perform adequately on the coal burned in the Parish
Units, resulting in frequent stack gas opacity "exceedences" that violated Joy's performance
guarantees. In order to comply with air-quality control regulations, HL&P replaced the ESPs with
cold-side, reverse air cleaned, fabric filtration devices ("baghouses") which Joy Manufacturing
also produced. (2) HL&P received a $10 million reduction in the price of the baghouses in
recognition of the problems with the ESPs. Through the end of the test year, HL&P had spent
approximately $140 million to replace the ESPs at the Parish Units. The actual final cost was
expected to be $185 million.

 Cities' third point of error complains of the Commission's decision to include these
upgrade costs in rate base. First, Cities asserts that the Commission failed to consider numerous
relevant factors, including: a) the extent to which the failure of the ESPs was due to Brown &
Root's negligence; b) the extent to which a prudent utility manager would have been able to
reduce or eliminate Brown & Root's negligence; c) the extent of HL&P's role with regard to the
design of the ESPs; d) whether the ESPs would have been needed to be replaced with baghouses
if Joy had met or satisfied its performance guarantees; e) whether it was possible to meet the
opacity limits without Brown & Root's construction deficiencies; f) the extent to which HL&P
sought to be compensated by Brown & Root with regard to its construction deficiencies; and g) 
whether the $10 million received from Joy benefited shareholders or ratepayers. In its second
motion for rehearing, however, Cities complained only that


 The cost of upgrading the Parish coal units by installing baghouses was the
direct result of the failure of the original manufacturer of the particulate control
equipment to satisfy its warranties. HL&P should have looked to the manufacturer
to collect these additional expenses, not the ratepayers. Substantial record
evidence does not exist to support a finding that the costs were reasonable. The
Commission's decision was arbitrary and capricious, is not supported by
substantial evidence, constitutes an abuse of discretion, and is contrary to law.


Thus, in its motions for rehearing, Cities directed its complaints to the reasonableness of the
upgrade costs and the propriety of recovering those costs from the ratepayer instead of the
manufacturer. Cities did not complaint of the Commission's failure to consider any particular
factor. Complaints not presented to the Commission by motion for rehearing are waived. APA
§ 2001.145(a); Burke v. Central Educ. Agency, 725 S.W.2d 393 (Tex. App.Austin 1987, writ
ref'd n.r.e.). Cities has, therefore, waived any complaint that the Commission did not consider
other factors.

 Cities also complains, under its third point of error, that the Commission's decision
was not supported by substantial evidence. In conducting a substantial-evidence review, we must
determine whether the evidence as a whole is such that reasonable minds could have reached the
conclusion the agency must have reached in order to take the disputed action. Texas State Bd. of
Dental Examiners v. Sizemore, 759 S.W.2d 114, 116 (Tex. 1988), cert. denied, 490 U.S. 1080
(1989); Texas Health Facilities Comm'n v. Charter Medical-Dallas, Inc., 665 S.W.2d 446, 453
(Tex. 1984). We may not substitute our judgment for that of the agency and may consider only
the record on which the agency based its decision. Sizemore, 759 S.W.2d at 116. The appealing
party bears the burden of showing a lack of substantial evidence. Charter Medical, 665 S.W.2d
at 453. It cannot meet this burden merely by showing that the evidence preponderates against the
agency decision. Id. at 452. If substantial evidence would support either affirmative or negative
findings, we must uphold the agency's order, resolving any conflict in favor of the agency's
decision. Auto Convoy Co. v. Railroad Comm'n, 507 S.W.2d 718, 722 (Tex. 1974); Warner v.
City of Lufkin, 582 S.W.2d 165, 167 (Tex. Civ. App.Beaumont 1979, writ ref'd n.r.e.).

 The record before the agency indicated the following background facts regarding
the Parish upgrades. During the 1970s, when the Parish Units were constructed, the prevailing
industry practice was to install either hot-side or cold-side ESPs for air-quality control. Baghouse
installation was an infant technology and lacked any operating experience on large units. With
regard to ESPs, the industry consensus was that hot-side ESPs were effective without regard to
the different chemical characteristics of various types of coal. Cold-side ESPs, on the other hand,
had to be designed specifically around the type of coal to be burned in the unit. Furthermore, hot-side ESPs were less expensive than cold-side ESPs. Consequently, hot-side ESPs were installed
at the Parish Units.

 Throughout the industry, generating units that employed hot-side ESPs experienced
air-quality control problems, apparently because hot-side ESPs were not effective, as originally
believed, on all types of coal. These problems were unrelated to any specific ESP manufacturer. 
The Parish air-quality control problems, as in other units in the industry, appeared to be caused
primarily by the type of coal burned. Construction deficiencies, however, aggravated the Parish
Units' problems.

 HL&P created a task force to examine the Parish ESP problems and recommend
solutions. In 1984, the task force issued its report, which included a discussion of litigation and
settlement negotiations by other utilities with hot-side ESPs that burned coal similar to that at
Parish. Although most of these utilities had filed suit against their ESP manufacturer, only two
had resolved their disputes. The report notes that one plaintiff, Colorado Ute, had prevailed in
court, but does not give the amount of the recovery, and that the other plaintiff, City Public
Service Board of San Antonio, had reached an out-of-court settlement regarding two of its plants
valued at approximately $2 million. The report states that while HL&P's case appeared strong
with respect to Unit 7, it was weaker for Units 5 and 6 because of the construction defects.

 The HL&P task force determined that replacing the ESPs with baghouses was the
least expensive and lowest risk solution. By this time, baghouses had become the best available
control technology for the types of coal burned in the Parish Units. Joy Manufacturing was
selected through a competitive bidding process to install baghouses at the Parish Units. HL&P
then negotiated a $10 million reduction in the price of the baghouses in recognition of the earlier
ESP problems.

 The Commission found that HL&P's original decision to use hot-side ESPs at the
Parish Units, and its attempts to resolve the ESP problems, were prudent. Furthermore, the
execution of the upgrade project was found to be prudent and its costs found to be reasonable. 
The Commission determined that the entire requested amount of the Parish upgrade was used and
useful and should be placed in HL&P's rate base. Considering the evidence as a whole, we
believe that reasonable minds could have made the same findings and reached the same
conclusions. Thus, substantial evidence supports the Commission's action. We overrule Cities'
third point of error.


3. PLANT HELD FOR FUTURE USE

 In two points of error, Cities attacks the Commission's decision to include a portion
of the costs of HL&P's Malakoff Project, designated as plant held for future use, in rate base. 
In its first point of error, Cities complains that the Commission's decision to include these costs
is contrary to law and is not supported by substantial evidence. In its second point of error, Cities
contends that the Commission had no authority to include the costs in rate base other than as
construction work in progress ("CWIP") and asserts that the standards for CWIP were not met.

 HL&P's Malakoff project consists of two 645-megawatt lignite-fired generating
plants to be located near Malakoff in Henderson County, Texas. The units were originally
scheduled to begin commercial operation in 1987 and 1988. However, as projections of consumer
demand for electricity changed, the project schedule was revised. Active work on the project was
halted in 1987, but was scheduled to resume in 1991. Based on demand projections available at
the time of HL&P's rate case, the Malakoff units are scheduled to begin commercial operation in
1997 and 1999.

 HL&P had invested a total of $154.3 million in Malakoff at the time of the rate
case. Approximately $93 million of these costs were identified as potentially usable once
construction resumed; approximately $61.3 million, however, would not be usable. The
Commission included the $93 million of usable costs in rate base as plant held for future use
("PHFU") and, over a ten-year period, amortized the non-reusable outlays to cost of service.

 PURA sets forth the standard the Commission must follow in computing a utility's
rates. The Commission must


fix [the utility's] overall revenues at a level which will permit such utility a
reasonable opportunity to earn a reasonable return on its invested capital used and
useful in rendering service to the public over and above its reasonable and
necessary operating expenses.



PURA § 39(a) (emphasis added). With respect to invested capital, utility rates must


be based upon the original cost of property used by and useful to the public utility
in providing service including construction work in progress at cost as recorded on
the books of the utility. The inclusion of construction work in progress is an
exceptional form of rate relief to be granted only upon the demonstration by the
utility that such inclusion is necessary to the financial integrity of the utility. 
Construction work in progress shall not be included in the rate base for major
projects under construction to the extent that such projects have been inefficiently
or imprudently planned or managed. Original cost shall be the actual money cost,
or the actual money value of any consideration paid other than money, of the
property at the time it shall have been dedicated to public use, whether by the
utility which is the present owner or by a predecessor, less depreciation.


PURA § 41(a) (emphasis added). Thus, as a general rule, only assets that are "used and useful"
in providing service may be included in rate base.

 The Texas Supreme Court has recognized that the "used and useful" concept in
PURA embraces more than invested capital in the form of a commercially operating plant. In
addressing the Commission's exclusion of all land held by a utility for future use, the court, in
dicta, stated the following:


We agree with the courts below that the Commission erred in its blanket exclusion
of this property from the rate base. . . . In the future, the Commission should
consider the nature and present usefulness of the parcels of land and determine
whether or not such property should be included in the rate base.


Southwestern Bell Tel. Co. v. Public Util. Comm'n, 571 S.W.2d 503, 516 (Tex. 1978) (emphasis
added). The court recognized that property which has a present benefit or usefulness may be
considered used and useful, even though that property is not yet in the form of a commercially
operating plant. Accordingly, we reject Cities' argument that no amount may be included in rate
base as PHFU.

 A majority of other states also allow some amount of PHFU in rate base. See Paul
Rodgers, National Ass'n of Regulatory Utility Commissioners, Utility Regulatory Policy in the
United States and Canada Compilation 1991-1992 Table 27 (Karon Bauer ed.). State regulatory
authorities commonly use one of two general criteria for determining what portion of PHFU to
include in rate base: First, some authorities allow PHFU in rate base where the utility
demonstrates that the PHFU will be used and useful within a short period of time. Robert L.
Hahne & Gregory E. Aliff, Accounting for Public Utilities § 4.04[6] (1993). Second, other
authorities allow PHFU in rate base where the utility demonstrates that the PHFU is associated
with a definite plan for use in the foreseeable future and will result in benefits to ratepayers. Id.

 The Commission, on an ad hoc basis, has developed guidelines for inclusion of
PHFU in rate base in Texas. Under these guidelines, PHFU may be included in rate base where
the utility shows specific plans insuring that the investment will be fully used and useful in
providing service within ten years. The guidelines are intended to balance conflicting policy
considerations. As explained by the Commission,


On the one hand, cost savings can be achieved by the advance investment in plant
which will not be fully useful until future years. The allowance of return on
PHFU can thus be of present use in the avoidance of higher future plant acquisition
costs by providing an incentive for utilities to operate in an economically efficient
manner through use of foresight and advance planning in plant acquisition. On the
other hand, there is no guarantee that PHFU will eventually be utilized in the
provision of utility service, and therefore, inclusion of PHFU in rate base can
result in ratepayers providing a return for a substantial period of time on
investment which is never used or useful in providing service to ratepayers. 
Further, the Commission has in the past recognized that current ratepayers should
not be required to pay a return on capital assets whose benefit to them is too
remote.



Application of West Tex. Utils. Co. for Authority to Change Rates, Docket No. 7510, 14 P.U.C.
Bull. 620, 650-56 (1989); see also Application of Gulf States Utils. Co. for a Rate Increase,
Docket 5560, 10 P.U.C. Bull. 405, 441-43 (1984); Application of Dallas Power & Light Co. for
Authority to Change Rates, Docket 3460, 6 P.U.C. Bull. 720, 725-26 (1981).

 In accordance with the supreme court's directive in Southwestern Bell, the
Commission's ten-year test focuses on the present usefulness of the investment. Investments that
will be used under a definite plan within ten years are deemed to be presently useful to ratepayers. 
Inclusion of PHFU in rate base under this test provides utilities with an incentive to engage in
advance planning, while at the same time protecting current ratepayers from paying for services
that are too remote. Thus, the inclusion in rate base of PHFU is authorized by both the letter and
spirit of PURA. PURA §§ 39(a), 41(a); Southwestern Bell, 571 S.W.2d at 516.

 In its second point of error, Cities contends that the Commission had no authority
to include the costs in rate base other than as CWIP and asserts that those standards were not met. 
We reject this contention. The Commission was authorized to include PHFU in rate base as a
used and useful asset. PURA §§ 39(a), 41(a); Southwestern Bell, 571 S.W.2d at 516. Therefore,
the standards for inclusion as CWIP were inapplicable. Cities also asserts that PHFU should be
held to the same, if not higher, standard as CWIP. We disagree. CWIP is an exceptional form
of rate relief, and may be included in rate base only where it is necessary to maintain the utility's
financial integrity. Furthermore, none of the CWIP allowance may represent projects that were
inefficiently or imprudently planned or managed. PURA § 41(a); see State v. Office of Pub. Util.
Counsel, 849 S.W.2d 864 (Tex. App.Austin), writ dism'd by agr., 866 S.W.2d 209 (Tex. 1993).

 The policy rationale for allowing PHFU in rate base does not exist for CWIP. 
PHFU provides an incentive for advance planning. Charles F. Phillips, Jr., The Regulation of
Public Utilities, Theory and Practice 350 (1993). CWIP, on the other hand, is a method for
recovering construction financing costs of plants under active construction. James C. Bonbright,
Albert L. Danielson, & David R. Kamerschen, Principles of Public Utility Rates 246 (2d ed.
1988). CWIP represents a recognition that construction of modern utility plants may tie up large
amounts of capital for a long period of time. See Phillips, supra at 354-56. Although recovery
of the invested capital is imminent once construction begins, CWIP is allowed in those exceptional
circumstances where the utility is unable to wait for traditional rate relief. Assets in PHFU, in
contrast, traditionally represent investments made at a time when active construction is in the
future, such that no rate relief is presently in sight. We therefore conclude that the CWIP
standards do not apply to PHFU.

 Finally, Cities contends that the Commission's decision to include the Malakoff
PHFU is not supported by substantial evidence. HL&P presented evidence describing its planning
process, its plan for adding generating capacity, the role of Malakoff in that plan, and the specific
plans for Malakoff's reactivation. The Commission was also presented with load forecasts
indicating that HL&P would need additional capacity in 1997. Other evidence showed that
Malakoff could be completed at a significantly lower cost than a new generating facility and had
a shorter lead-time than other lignite alternatives. As one witness explained,


The cost of building and operating Malakoff is competitive with other available
coal or lignite based options. However, Malakoff presents several advantages not
available with a grass roots project. . . . [M]uch of the existing engineering for the
plant has been completed and remains valid, thereby reducing the lead time needed
to build the project in comparison to a completely new plant. In order to achieve
commercial operation of Unit 1 by the peak of 1997, activity on the Malakoff
project must be reactivated by January of 1991. In comparison, a new coal or
lignite plant typically requires seven to eight years from project inception to
completion. The shorter response time associated with Malakoff provides valuable
benefit by allowing the Company to examine projections of critical parameters such
as fuel prices, load growth, etc. at a later date than possible with a new project. 
Thus by retaining Malakoff as a supply option, HL&P will be able to assess supply
alternatives as late as January of 1991 to meet an anticipated 1997 requirement,
without foregoing the opportunity to include a solid fuel based alternative.


The Commission found that HL&P demonstrated "a definite and credible plan for using Malakoff
within ten years," that HL&P's decision to postpone the completion of Malakoff was prudent, and
that $93 million in potentially usable costs should be allowed in rate base. (3) Considering the
evidence as a whole, we believe that reasonable minds could have made the same findings and
reached the same conclusions. The Commission's action is supported by substantial evidence. 
We overrule Cities' first and second points of error.



THE STATE'S APPEAL


1. Res Judicata

 In the State's first point of error, it asserts that the Commission improperly
reconsidered certain financial-integrity findings made in earlier dockets. In Docket No. 8230, the
Commission found that a failure to grant deferred accounting as to the costs of Unit 1 would
impair HL&P's financial integrity; accordingly, the Commission authorized deferred accounting
by permitting HL&P to capitalize costs of Unit 1 from August 25, 1988 (Unit 1's commercial
operation date) to November 23, 1989. In Docket No. 9010, the Commission found that an
extension of deferred-accounting treatment as to the costs of Unit 1 would help preserve HL&P's
financial integrity; accordingly, the Commission extended Unit 1 deferred accounting until Unit
1 was actually included in rate base.

 Subsequently, in Docket No. 8425, the Commission found that deferred accounting
treatment of the costs of Unit 2 was necessary to ensure HL&P's access to capital markets on
reasonable terms. The State argues that this last finding constituted a reconsideration of the
Commission's earlier findings regarding HL&P's financial integrity. We disagree.

 The Commission's findings in the first two dockets considered only the impact on
HL&P's financial integrity of commencement of commercial operation of Unit 1. Those findings
amount to findings that a failure to grant deferral of the costs of Unit 1 would impair HL&P's
financial integrity. In that inquiry, the Commission did not consider the impact of the costs of
commencement of operation of Unit 2. Thus, the Commission found only that deferral of Unit
1's costs was necessary to HL&P's financial integrity; it did not find that deferral of those costs
was sufficient to guarantee HL&P's financial integrity into the future. In the later docket, on the
other hand, the Commission addressed a completely different question: whether deferral of the
additional costs associated with the commencement of commercial operation of Unit 2 was also
necessary to HL&P's financial integrity. The Commission did not, therefore, reexamine the
necessity for deferral of Unit 1 costs. We overrule the State's first point of error.


2. Ratemaking Proceeding

 In its fifth point of error, the State asserts that HL&P's request for deferred-accounting treatment of certain costs should have been conducted as a ratemaking proceeding, so
that procedures mandated by PURA § 43 were used. The State argues that deferred accounting
treatment is a practice affecting compensation, and therefore is a rate. See PURA § 3(d).

 The Texas Supreme Court has decided this same issue adversely to the State in
State v. Public Utility Commission, 37 Tex. Sup. Ct. J. 1102 (June 22, 1994). In that case, the
supreme court recognized that accounting practice and ratemaking procedure are distinct and
separate concepts. Id. at 1107. The Commission may authorize deferred-accounting treatment
to allow a utility to recognize a deferred cost asset on its books until a subsequent rate hearing,
when the asset will be evaluated as any other asset for inclusion in rate base. Id. Only on the
issuance of a subsequent order setting rates will the deferred asset be included in rate base and
affect the utility's compensation. Id. Because the Commission's authorization of deferred-accounting treatment was not a practice affecting HL&P's compensation, it was not a rate and
PURA § 43 procedures were not required. We overrule the State's fifth point of error.

3. Deferred-Accounting Treatment

 In point of error two, the State asserts that the deferred-accounting treatment
allowed by the Commission violates PURA §§ 41(a) and 39. In point of error three, the State
asserts that the approval of deferred-accounting treatment is improper because only bonded and
interim rates can be used to protect a utility against regulatory lag. In point of error four, the
State contends that deferred-accounting treatment constitutes impermissible retroactive ratemaking.

 These arguments were also addressed in State v. Public Utility Commission, 37
Tex. Sup. Ct. J. 1102 (June 22, 1994), and City of El Paso v. Public Utility Commission, 37 Tex.
Sup. Ct. J. 1092 (June 22, 1994). In those cases, the supreme court recognized that the
Commission has broad authority to set and define a utility's system of accounts and may determine
the manner in which specific expenditures are to be recorded in carrying out the provisions of
PURA. State, 37 Tex. Sup. Ct. J. at 1103-04; City of El Paso, 37 Tex. Sup. Ct. J. at 1098; see
PURA § 27(a). Accordingly, the Commission may authorize deferred-accounting treatment for
post-in-service costs. State, 37 Tex. Sup. Ct. J. at 1104; City of El Paso, 37 Tex. Sup. Ct. J. at
1098. The existence in PURA of other methods to ameliorate regulatory lag does not foreclose
the Commission from authorizing deferred accounting, and reducing the impact of regulatory lag
does not equate to retroactive ratemaking. State, 37 Tex. Sup. Ct. J. at 1105, 1108. The
Commission's orders allowing deferred-accounting treatment do not inquire into the
reasonableness of prior rates or allow the utility to recoup losses resulting from previously set
rates which were insufficient. Id. at 1108. Furthermore, the deferred assets were not a factor in
the old rates. Id. We overrule the State's second, third, and fourth points of error.


CONCLUSION


 We sustain Cities' fourth point of error; we reverse the portion of the district
court's judgment upholding the Commission's failure to require that tax savings associated with
disallowed expenses be passed on to consumers, and we render judgment that the cause be
remanded to the Commission with instructions to adjust HL&P's cost of service consistent with
this opinion. We overrule Cities' other points of error and the State's five points of error and
affirm the remainder of the district court's judgment.



 J. Woodfin Jones, Justice

Before Justices Powers, Jones and Kidd

Affirmed in Part; Reversed and Rendered in Part

Filed: August 31, 1994

Publish
1. As explained by one witness,


Hot-side precipitators and cold-side precipitators were alternative technologies
for removing particles from the flue gas resulting from the combustion of coal
in power plants. The precipitators are electrostatic devices which work on the
principle that opposite electric charges attract. In the precipitators, electrodes
impart an electric charge to the particles in the flue gas. The charged particles
are then collected on oppositely charged collection plates.


The terms `hot-side' and `cold-side' refer to the location of the precipitator in
relation to the air preheater. Equipment located on the boiler side or upstream
side of the air heater is termed `hot-side' and equipment on the discharge side
(gas directed toward the stack) is termed `cold-side'.

2. Testimony revealed that in baghouses "the flue gas is filtered through large fabric bags
in a process similar to the operation of a vacuum cleaner."
3. Because the entire $93 million in costs had previously been included in rate base as
CWIP, the Commission had necessarily found in an earlier proceeding that these same costs
had been prudently incurred. See PURA § 41(a); Petition of Houston Lighting & Power Co.
for a Rate Increase, Docket No. 6765, 13 P.U.C. Bull. 1 (1987). For that reason, the
prudence of the costs (as opposed to the prudence of the decision to postpone construction)
was not an issue in the present proceeding. It goes without saying, however, that only
prudently incurred costs may be included in rate base as plant held for future use.