**CITIES FOR FAIR UTILITY RATES and The State of Texas, Petitioners,**

v.

**PUBLIC UTILITY COMMISSION OF TEXAS and Houston Lighting & Power Company, Respondents.**

No. 94–1237.

Supreme Court of Texas.

Argued Sept. 6, 1995.

Decided June 28, 1996.

James G. Boyle, Rupaco T. Gonzalez, Dan Morales, Richard A. Muscat, Austin, for petitioners.

Robert J. Hearon, Selden Anne Wallace, Hugh Rice Kelly, Austin, George W. Schalles, III, Houston, Steven Baron, Elizabeth R.B. Sterling, Mary A. Keeney, Austin, for respondents.

HECHT, Justice, delivered the opinion for a unanimous Court.

The principal question in this appeal from an order of the Public Utility Commission is whether an electric utility's costs of construction work in progress, CWIP, including an allowance for funds used during construction, AFUDC, can be included in its rate base as plant held for future use, PHFU, when construction has halted but the project remains viable. We agree with the PUC, the district court, and the court of appeals, that the answer is yes.

## I

We begin by looking at those aspects of utility ratemaking that form the legal setting for the present controversy, including accounting conventions for CWIP, AFUDC and PHFU. Utility ratemaking in Texas is governed by the Public Utility Regulatory Act of 1995, or PURA, TEX.REV.CIV.STAT.ANN. art. 1446c–0 (Vernon Supp.1996), a nonsubstantive recodification of the Public Utility Regulatory Act, Act of June 2, 1975, 64th Leg., R.S., ch. 721, 1975 Tex.Gen.Laws 2327 (formerly at TEX.REV.CIV.STAT.ANN. art. 1446c (Vernon Supp.1995)), to which we refer as "the 1975 Act". PURA, 74th Leg., R.S., ch. 9, § 3, 1995 Tex.Gen.Laws 31, 87. As there is no difference between PURA and the 1975 Act that affects this case, we refer to PURA whenever possible. The accounting conventions at issue are part of the uniform system of accounts prescribed by the Federal Energy Regulatory Commission, 18 C.F.R. pt. 101 (1995), which the PUC requires electric utilities to use, 16 TEX.ADMIN.CODE § 23.12(a)(2)(B) (West Supp.1995), under its statutory authority, PURA § 1.201(c).

■ Fundamentally, a public utility's rates must be "just and reasonable". PURA § 2.202. As a general rule,

> [i]n fixing the rates of a public utility, the regulatory authority shall fix its overall revenues at a level which will permit such utility a reasonable opportunity to earn a reasonable return on its invested capital used and useful in rendering service to the public over and above its reasonable and necessary operating expenses.

PURA § 2.203(a). Restated, the rule is that a utility's rates must be set so as to produce revenues equal to the sum of two amounts. One is the utility's "reasonable and necessary operating expenses", including taxes and depreciation. The other is "a reasonable return on its invested capital used and useful in rendering service to the public". That capital is the utility's rate base. Thus, a utility is entitled to rates sufficient to repay its expenses, without a return or profit on those expenses, and to provide a return on the invested capital included in its rate base, without repaying that investment.

■ A utility's cost of constructing a facility for use in providing service is ordinarily not an operating expense; obviously, until the facility is completed, there is nothing to operate. Rather, the cost of constructing a new facility, like the purchase price of an existing facility, is an investment of capital in an asset to be used in the future. As such, it must be included in a utility's rate base, but not until the facility has become "used and useful in rendering service to the public". "Used and useful" refers to "such property as has been acquired ... in good faith and held for use in the reasonably near future in order to enable [a utility] to supply and furnish adequate and uninterrupted ... service." *Lone Star Gas Co. v. State,* 137 Tex. 279, 153 S.W.2d 681, 698 (1941).

Historically, a facility under construction has not been considered used or useful in providing service until it actually becomes operational. CHARLES F. PHILLIPS, JR., THE REGULATION OF PUBLIC UTILITIES 354–355 (3d ed. 1993); RICHARD J. PIERCE, JR. & ERNEST GELLHORN, REGULATED INDUSTRIES 112 (3d ed. 1994). In this view, construction costs are not included in rate base until construction is complete. Meanwhile, they are accrued in an account for construction work in progress, or CWIP, for short. *See* 18 C.F.R. pt. 101, at 284 (Account 107).

The cost of the capital used to pay construction costs is also part of the investment in the facility. 1 A.J.G. PRIEST, PRINCIPLES OF PUBLIC UTILITY REGULATION, 178–180 (1969). Recognizing this, uniform accounting rules adopted by the Federal Power Commission in 1937 and followed in most states allowed a utility to include in its cost accounting an amount for "interest during construction". PHILLIPS, *supra,* at 354. In 1971 the FPC substituted the phrase "allowance for funds used during construction", or AFUDC, for interest, but the basic idea remained the same. *Id.* AFUDC is now part of FERC's uniform accounting system. 18 C.F.R. pt. 101, at 269. While construction is continuing, AFUDC accrues on CWIP. AFUDC does not represent a transfer of funds; it is simply an entry in a utility's books to indicate the cost of capital used during construction. When construction is complete and the facili-

ty operational, both CWIP and AFUDC are transferred to the utility's rate base, and the utility begins to earn a return on its investment in both. PHILLIPS, *supra*, at 354; PIERCE & GELLHORN, *supra*, at 113.

Although this method of accounting—accumulating CWIP and AFUDC and then transferring them to the rate base—should allow a utility a fair return on its investment in a new project, actual payment of that return does not begin until after construction is completed. Thus, in essence, a utility advances the cost of construction until the work is done, and only then begins to profit from its investment. "[C]onsumer groups universally contend that [this accounting] procedure results in a correct match of costs and benefits between present and future customers" of a utility. PHILLIPS, *supra*, at 354. In other words, present customers should not pay rates for benefits only future customers will realize.

However, if costs of capital and construction are high, and construction periods are lengthy, the funds "advanced"—actually expended by a utility—can be so large over so long a time that they cause the utility serious cash flow problems. Expenditures may become enormous before any return at all is realized. That is precisely what began to happen in the late 1960s. *See generally* LAWRENCE S. POMERANTZ & JAMES E. SUELFLOW, ALLOWANCE FOR FUNDS USED DURING CONSTRUCTION 1–7 (1975) (detailing the financial positions of major gas and electric utilities in light of large construction projects during the 1960s and early 1970s). To accommodate a utility's real financial difficulties, and still preserve an accounting procedure historically viewed as fair to present and future utility customers, regulators began to allow CWIP to be included in the rate base before completion of construction, but only when it was necessary for the financial integrity of the utility. PHILLIPS, *supra*, at 354–355; PIERCE & GELLHORN, *supra*, at 115–116. To the extent the utility is financially able to bear accrual of construction costs, deferring inclusion in rate base until construction is completed is fairest to present and future ratepayers. When the burden is too great, however, present customers must

share in the prudent provision of service for the future.

In Texas, this change was reflected in the 1975 Act, which expressly allowed for the early inclusion of CWIP in rate base:

> Utility rates shall be based upon the adjusted value of property used by and useful to the public utility in providing service including where necessary to the financial integrity of the utility construction work in progress at cost as recorded on the books of the utility.

The 1975 Act, § 41(a). Before 1975, a utility was limited to "a fair return upon the fair value of the property used and useful in rendering its service to the public". Act of April 2, 1937, 45th Leg., R.S., ch. 144, § 1, 1937 Tex.Gen.Laws 274, 275 (formerly at TEX.REV.CIV.STAT.ANN. art. 1119 (Vernon 1963)). The pre–1975 statute did not mention CWIP. In 1983, the Legislature amended Section 41(a) of the 1975 Act to clarify the treatment of CWIP. Act of May 26, 1983, 68th Leg., R.S., ch. 274, § 1, 1983 Tex.Gen. Laws 1258, 1297 (formerly at TEX.REV.CIV. STAT.ANN. art. 1446c, § 41(a) (Vernon Supp. 1995)). The amended language has been recodified as PURA Section 2.206(a)–(b):

> (a) Utility rates shall be based on the original cost of property used by and useful to the public utility in providing service, including construction work in progress at cost as recorded on the books of the utility.
>
> (b) The inclusion of construction work in progress is an exceptional form of rate relief to be granted only upon the demonstration by the utility that such inclusion is necessary to the financial integrity of the utility. Construction work in progress may not be included in the rate base for major projects under construction to the extent that such projects have been inefficiently or imprudently planned or managed.

While the statute makes CWIP in rate base "an exceptional form of rate relief", allowed only for expenses prudently incurred and when necessary to the financial integrity of the utility, CWIP inclusion is not an exception to the general rule that costs cannot be included in rate base unless they are used and useful in providing service. The statute

expressly recognizes that used and useful expenses can include CWIP.

Besides construction costs, other expenditures for a facility that will not be productive until a future date may also be included in a utility's rate base as plant held for future use, or PHFU. PHILLIPS, *supra*, at 349–353; PRIEST, *supra*, at 180–181; 18 C.F.R. pt. 101, at 283–284 (Account 105). One example is the cost of land on which a facility is to be built. PHILLIPS, *supra*, at 350. Land must be acquired when available, which may be years before the facility planned for the site is completed or even begun. Other common examples of such expenditures are water rights and leaseholds.· *Id.* at 351–352. Expenditures for PHFU are ordinarily quite small in relation to the total cost of the planned project, *id.* at 350, and hence minuscule in relation to a utility's rate base. Thus, their inclusion in rate base only minimally impacts present ratepayers while it encourages utilities to plan well ahead for future demands for service. While it is not fair to charge present ratepayers with the cost of future service, neither is it fair to burden future ratepayers with unnecessarily high acquisition costs because a utility was discouraged from making prudent long-term plans. PHFU expenses are used and useful because they are a necessary part of planned investments. Most states include PHFU in rate base in some circumstances. PAUL RODGERS, NAT'L ASS'N OF REGULATORY UTIL. COMM'RS, UTILITY REGULATORY POLICY IN THE UNITED STATES AND CANADA: COMPILATION 1991–1992 tbl. 27, at 67–68 (Karon Bauer ed., 1992).

In *Southwestern Bell Telephone Co. v. Public Utility Commission*, 571 S.W.2d 503, 516 (Tex.1978), we held that the acquisition costs of land held by a utility for future use could be used and useful in providing service and thus were not subject to blanket exclusion from rate base. We did not comment on the standards for including expenses in PHFU and have not had occasion to do so since. However, the PUC has formulated a general policy for inclusion of PHFU in rate base:

The Commission has consistently permitted the inclusion of PHFU in rate base where the applicant demonstrates specific plans insuring that the particular investment will be fully used and useful in providing electric service to the public within a ten year period from test year end. The Commission's ten year test for PHFU is intended as a balancing of conflicting policy considerations. On the one hand, cost savings can be achieved by the advance investment in plant which will not be fully useful until future years. The allowance of return on PHFU can thus be of present use in the avoidance of higher future plant acquisition costs by providing an incentive for utilities to operate in an economically efficient manner through use of foresight and advance planning in plant acquisition. On the other hand, there is no guarantee that PHFU will eventually be utilized in the provision of utility service, and therefore, inclusion of PHFU in rate base can result in ratepayers providing a return for a substantial period of time on investment which is never used or useful in providing service to ratepayers. Further, the Commission has in the past recognized that current ratepayers should not be required to pay a return on capital assets whose benefit to them is too remote.

Tex.Pub.Util.Comm'n, *Application of West Texas Utilities Company for Authority to Change Rates*, Docket No. 7510, 14 TEX. P.U.C.BULL. 620, 651 (Nov. 30, 1987) (citation omitted). In sum, the PUC's policy is that expenses can be treated as PHFU and included in rate base only if they are prudently incurred and are an investment that will be operational within ten years. This policy is consistent with FERC accounting guidelines that allow PHFU to include the original cost of property owned and held under a definite plan for future use in electric service. 18 C.F.R. pt. 101, at 283 (Account 105). When property ceases to meet this requirement, the cost must be removed from PHFU. *Id.* at 283–284.

Although CWIP and PHFU both relate to facilities that will not be operational until a future date, they differ in several respects important to this case. For one thing, expenses cannot be accrued as CWIP unless, as the words of the acronym indicate, construction work is actually in progress. 18 C.F.R. pt. 101, at 284 (Account 107). When con-

struction ceases, the account must be cleared "as soon as practicable". *Id.*; *see* JAMES E. SUELFLOW, PUBLIC UTILITY ACCOUNTING 164 (1973). The same requirements do not apply to PHFU. Expenditures may be posted to PHFU absent ongoing construction. All that is required for PHFU is that there be a specific plan for using the expenditure in providing service within ten years.

For another thing, because the cost of constructing a project is usually far greater than the expenses of planning and preparation, CWIP amounts are typically much larger than PHFU amounts. This distinction leads to a difference in the way CWIP and PHFU are treated for ratemaking. CWIP cannot be included in rate base except to the extent "necessary to the financial integrity of the utility." PURA § 2.206(b). This limitation need not be applied to PHFU because the impact on ratepayers is usually insignificant. Furthermore, if the limitation were applied, the usually small amounts of PHFU would never meet the limitation, and the policy goal of PHFU—encouraging utilities to plan in advance—would consequently be defeated.

With this legal background in mind, we turn to the facts of the present controversy.

## II

Houston Lighting & Power Company is an electric utility servicing some 1.5 million customers in a 5000–square–mile area of the Texas Gulf Coast. It has a rate base of some $6 billion.

In 1982 the PUC issued HL & P a certificate of convenience and necessity to construct two lignite-fired, 645–megawatt generating units near the town of Malakoff, Texas. Tex.Pub.Util Comm'n, *In re Houston Lighting & Power Co.*, Docket No. 4472, 8 TEX. P.U.C.BULL. 150, 150 (Oct. 22, 1982). One unit was to be completed in 1988 and the other in 1989. No sooner was construction underway than HL & P began to revise its forecasts of demand for electricity and reassess its need for the units. Thus, in 1983 HL & P announced that completion of the Malakoff units would be delayed to 1990 and 1991. In 1985 HL & P again projected a delay in completion dates to 1992 and 1994. The

same year the PUC reexamined the Malakoff project but dismissed a cancellation petition. Docket No. 5755, 11 TEX.P.U.C.BULL. 362, 362 (Feb. 4, 1985). Finally, in 1987 HL & P discontinued construction at Malakoff altogether, planning to resume in 1991 and complete the units in 1997 and 1999.

HL & P's total construction costs at Malakoff, $154.3 million, were accrued as CWIP and included almost $10 million in AFUDC. In 1985 the PUC approved inclusion of half HL & P's accrued CWIP in its rate base. Tex.Public Util. Comm'n, *Application of Houston Lighting and Power Company for a Rate Increase*, Docket No. 5779, 12 TEX. P.U.C.BULL. 261, 444, 515, 534 (Jan. 11, 1985). The following year the PUC approved inclusion of 32 percent of accrued CWIP in rate base. Docket No. 6765, 13 TEX.P.U.C.BULL. 1, 438 (Nov. 14, 1986). Cessation of construction required a change in accounting, which HL & P requested as part of its application to the PUC in 1988 for a 15.5 percent, or $446,198,000, increase in annual revenue. Docket No. 8425, 16 TEX. P.U.C.BULL. 2199, 2222 (June 20, 1990). It is from the final order in this proceeding, Docket 8425, that the parties before us have appealed.

HL & P argued that the portion of construction costs that would be usable when construction recommenced in 1991 should be transferred to PHFU and included in the rate base, and that the balance should be amortized to cost of service. HL & P calculated the usable costs at $93 million, mostly for engineering services and equipment, but including the almost $10 million AFUDC. *Id.* at 2254. HL & P did not argue that inclusion of the $93 million in rate base was necessary for its financial integrity; rather, it argued that such a showing, though statutorily required for CWIP, was not necessary for PHFU. *Id.* at 2265.

HL & P's requested treatment of Malakoff costs was opposed by Texas Industrial Energy Consumers, an unincorporated association of 25 large industrial customers of HL & P; the City of Houston; the Houston Coalition of Cities (HCC), a group of cities serviced by HL & P; the Office of Public Utility Counsel;

and the PUC general counsel and staff. *Id.* at 2255. Two other parties, Dow Chemical Company and Cities for Fair Utility Rates (CFUR), the latter consisting of the cities of Galveston, Lake Jackson and Beach City, opposed inclusion of any Malakoff expenses in rate base but agreed that some of the $153.1 million expenses—Dow said $44 million and CFUR said $86.8 million—should be amortized to cost of service over a nine- or ten-year period, thus allowing HL & P to recoup them without return. *Id.* at 2257, 2259.

The hearing examiners concluded that HL & P should not be allowed to include $93 million of Malakoff construction costs in its rate base. Noting that when the costs were CWIP, HL & P could not include them in rate base without showing that inclusion was necessary to its financial integrity, the examiners observed:

> The only difference between Malakoff and construction work in progress is that Malakoff is not in progress. It is far less likely to be useful to today's ratepayers than the usual generating plant under construction. Yet HL & P would apply a standard which would allow it to be put in rate base more easily. HL & P's position is contrary to the Legislature's intent in passing PURA [Section 2.206].

> The examiners do not believe that the policy allowing Plant Held for Future Use in rate base was meant to apply to major generating projects under construction. If it was, however, it violates the strict provisions of PURA [Section 2.206].

*Id.* at 2265–2266. The examiners gave two other reasons for denying HL & P's request:

> Second, as several intervenors pointed out, HL & P's request violates the principle that, in general, ratepayers should pay for the costs incurred to serve them. The earliest that any of HL & P's ratepayers will see any benefit from Malakoff is 1997. Even that date is highly suspect. It is simply unfair to add the burden of Malakoff to current ratepayers' already heavy burden ... when Malakoff will not provide any electricity to the HL & P system for at least seven years.

> Third, even if PHFU treatment were theoretically appropriate, HL & P has not shown a definite and credible plan for using Malakoff within ten years. The plan is not definite because Malakoff has already been postponed three times and HL & P admits that it has not yet made a final decision to proceed toward a 1997 completion date. [An HL & P witness agreed] that Malakoff may be postponed again.... Even though the staff's load forecast implies the need for additional capacity beyond 1997, history shows clearly that load forecasting is an inexact process and that load growth depends upon many variables beyond the utility's, or anyone's, control.

*Id.* at 2266.

The examiners stated that "[t]he evidence that was presented supported the prudence of HL & P's investment in Malakoff itself", and rejected arguments "that HL & P should have cancelled or deactivated the plant in 1984", but recommended that a separate docket be created to examine these issues more carefully. *Id.* at 2267–2268. Thus, the examiners concluded that Malakoff was not used and useful to ratepayers in any way and that no part of HL & P's expenses should be included in cost of service or rate base. *Id.* at 2566. Alternatively, the examiners recommended granting HL & P's request to amortize $61.3 million in nonusable expenses to cost of service. *Id.* at 2267.

In 1990, the PUC, by a 2–1 vote, rejected the examiners' findings and recommendations on Malakoff and granted HL & P's request. The PUC found:

> 39. HL & P has shown a definite and credible plan for using Malakoff within ten years, as required for inclusion of the usable Malakoff costs in rate base as Plant Held for Future Use.

> 39A. HL & P's postponement of the completion of Malakoff was a prudent management decision.

> 39B. HL & P should be allowed to place the $93 million in potentially usable Malakoff investment in its rate base as Plant Held for Future Use.

> 40. HL & P should be allowed to amortize the $61.3 million in non-usable costs of Malakoff to its cost of service, without a

return, over a ten-year period. That treatment ... recognizes that return should not be allowed on investment that is not used to provide utility service.

*Id.* at 2713.

Commissioner Campbell dissented:

The Commission erred in placing approximately $91 million in usable Malakoff investment in rate base as plant held for future use and allowing the amortization of $63 million of "non-usable" Malakoff investment to HL & P's cost of service. The inclusion of Malakoff in invested capital violates PURA [Section 2.206]. Malakoff is neither used by nor useful to HL & P's ratepayers. It is construction work in progress, yet HL & P did not even attempt to meet the standards, set forth in PURA [Section 2.206], for the granting of that exceptional form of rate relief. The practice of including some types of utility investment in rate base as plant held for future use cannot take precedence over the clear restrictions contained in this Commission's enabling statute.

Moreover, HL & P has not even met the requirements for inclusion of investment as plant held for future use. Its plan for placing Malakoff into service within ten years is neither definite nor credible, considering Malakoff's track record and the flaws in HL & P's load forecast. The Commission does not have any reasonable assurance that Malakoff will be in service within ten years, if ever.

Finally, I agree with the examiners and the staff that the "non-usable" portion of the Malakoff investment should not be amortized to cost of service without further investigation. This Commission should be very hesitant to include Malakoff in rates when our own staff has stated that it needs more time to investigate the prudence of HL & P's actions.

*Id.* at 2692–2693.

CFUR, the City of Houston, HCC and others appealed the PUC's decision to the district court, complaining of the treatment of $93 million Malakoff expenses as PHFU and other aspects of the PUC's ruling. No party appealed the PUC's decision to amortize $61.3 million of Malakoff expenses to

cost of service, or the PUC's conclusion that all Malakoff expenses were prudently incurred. The State of Texas also appealed, but from another portion of the ruling. We discuss the State's appeal at the conclusion of this opinion. The district court affirmed the PUC in all respects, and only two CFUR cities, Lake Jackson and Beach City, and the State appealed. On CFUR's appeal, the court of appeals affirmed the PUC's inclusion of $93 million Malakoff expenses in HL & P's rate base. 884 S.W.2d 540, 546–549.

Although we must review the PUC's order in the light of the record developed from 1988 to 1990, we note briefly the developments in the Malakoff project since the evidence in this case was closed.

In 1991 HL & P again delayed the projected completion dates of the two units until 2000 and 2002. In late 1991 the PUC again found that "HL & P has shown a definite and credible plan for using Malakoff within ten years, as required for inclusion of the usable Malakoff costs in rate base as plant held for future use." Tex.Public Util.Comm'n, *Application of Houston Lighting and Power Company for Authority to Change Rates,* Docket No. 9850, 17 Tex.P.U.C.Bull. 3063, 3329 (Oct. 23, 1991). However, the PUC also stated that it would review the "designation of the Malakoff plant as plant held for future use ... in every rate case for which such continued treatment is sought." *Id.* There appears to have been no appeal of this order. In 1992, HL & P projected a completion date for one unit of 2005 and no date for the other, but before the year was over, HL & P had determined that $84 million of the $93 million included as PHFU was no longer useful for any future construction and began to treat it as expenses amortized.to cost of service rather than investment on which it was entitled to a return. In 1994 the PUC found that the Malakoff project was, "for all practical purposes, cancelled." Docket No. 10832, 20 Tex.P.U.C.Bull. 312, 398 (June 9, 1994).

These events do not moot the present controversy. We must still decide whether the PUC's treatment of Malakoff expenses was correct for whatever time it was in effect.

## III

CFUR argues that the Malakoff expenses do not qualify as PHFU, and that even if they did, their inclusion in HL & P's rate base violates PURA.

As we have observed, the PUC's policy, consistent with the FERC uniform system of accounts generally followed by most states, is that prudent investments in property that will be operational within ten years under a definite plan may be treated as PHFU and included in rate base. No party here questions that the Malakoff expenses were prudently incurred, or that the portion that could have been usable in completing the plant was $93 million. CFUR argues only that HL & P presented no viable plan for ever bringing the plant on-line. The PUC's contrary finding must be upheld if substantial evidence in the record supports it. *City of El Paso v. Public Util. Comm'n,* 883 S.W.2d 179, 185 (Tex.1994). HL & P presented evidence of its plans to complete Malakoff, despite repeated delays, and to meet projected demands for electricity. 16 TEX. P.U.C. BULL. at 2255–2257, 2262–2264. Although the evidence was contested, we cannot say that the PUC's finding was unreasonable. We now know that HL & P's plan was not ultimately viable, but we also know that when construction was cancelled, HL & P ceased to treat most of the $93 million as part of its rate base. In any event, the PUC's order must be reviewed on the evidence at the time and not with unerring hindsight. The PUC did not err in treating $93 million in Malakoff expenses as PHFU.

CFUR contends, however, that PURA does not allow inclusion of PHFU in rate base except as necessary for a utility's financial integrity. Although PURA is silent on this issue, CFUR argues that the financial-integrity limitation on inclusion of CWIP in rate base should apply equally to PHFU. But as we have noted, the reason for the limitation on including CWIP in rate base does not apply to PHFU. Excluding CWIP from rate base except when necessary for a utility's financial integrity balances the burden on present and future ratepayers of construction of expensive facilities over protracted periods. The usually smaller amounts of PHFU do not present the same issues of fairness to existing and future customers. Moreover, because PHFU amounts are usually smaller, they would rarely impact a utility's financial integrity and thus could never meet that qualification for inclusion in rate base. Consequently, the incentive PHFU provides for long-range planning would be destroyed.

PURA does not impose a financial-integrity limitation on inclusion of PHFU in rate base, and we decline to infer one when to do so would undercut almost any use of PHFU. We believe the PUC's policy for PHFU is workable and consistent with PURA.

CFUR nevertheless argues that in *this* case, at least, the Malakoff expenses treated as PHFU should not be included in rate base. For one thing, CFUR argues, they are larger than and different from most expenses treated as PHFU. We do not think the differences are important. CFUR argues that PHFU expenses are typically for non-manmade resources, such as land. But neither FERC accounting rules nor PUC policy restricts PHFU by type of expense. The engineering expenses at Malakoff were no less an investment in plant than the purchase of the land for the facility, which clearly would have qualified as PHFU. While the amount of PHFU expenses may be larger than usual, the effect on ratepayers was very small. HL & P estimates that the difference between including $93 million in its rate base and amortizing it to cost of service was $641,700 per year, or about ⅒₀th of one percent of its $6 billion rate base. CFUR has not challenged this estimate.

CFUR contends that recharacterizing CWIP as PHFU to achieve inclusion in rate base without a showing of financial necessity is simply "accounting trickery". We disagree. While construction was ongoing, expenses were required to be accrued as CWIP rather than PHFU. Once it ceased, those expenses were required to be reclassified. HL & P did not simply manipulate its accounts; its operations and plans changed because of changing market conditions. The PUC was entitled to consider those changes,

and the different policies served by CWIP and PHFU, in making its decision.

CFUR also appears to argue that it may somehow be easier or more advantageous for a utility to treat costs as PHFU rather than CWIP. But the two accounts are not interchangeable. PHFU is not for construction costs, and CWIP is not for anything but such costs. In this case, of course, amounts once treated as CWIP were transferred to PHFU, but only when construction ceased. HL & P could not have treated costs of ongoing construction as PHFU and thereby have included them in rate base without showing the necessity for its financial integrity.

CFUR argues that a transfer of CWIP to PHFU is unprecedented. While that may be true, the circumstances of this case are unusual. Had HL & P incurred expenses similar in type and amount before construction actually began, there would be little ground for objecting to their treatment as PHFU. The principal concern in this case has been that Malakoff expenses were treated as PHFU in the interim when construction was discontinued and the future still in doubt. The peculiar timing of events in this case does not prevent expenses that qualify as PHFU from being treated as such.

CFUR argues that the AFUDC included in CWIP should not have been treated as PHFU. As we have seen, however, AFUDC is as much a part of a utility's capital investment in a facility as construction costs. AFUDC would be included in rate base on completion of construction, or on a showing of necessity for a utility's financial integrity. There is no reason why it should not be treated as PHFU if it otherwise qualifies, as it did in this case.

CFUR's fundamental concern is that PHFU may provide a utility a means of circumventing the used and useful requirement of PURA. We do not believe that has happened in this case, and we think the PUC's existing policy will prevent it from occurring in other cases. That policy may change over time. Utility regulation is not a static enterprise. We have summarized how the treatment of CWIP has changed in the past three decades. Future market conditions may require other changes in policies affecting CWIP and PHFU. At present, however, we are satisfied that the PUC's policy protects against misuse of PHFU.

## IV

Two additional issues require brief discussion.

### A

■ The State, as we have said, has appealed from an entirely different portion of the PUC's order in Docket 8425. The PUC granted HL & P deferred accounting treatment for its South Texas Nuclear Project Unit 2 costs as necessary to ensure its financial integrity beginning June 19, 1989. In prior proceedings the PUC had allowed HL & P deferred accounting treatment for its Unit 1 costs at the same project as necessary to ensure its financial integrity from August 25, 1988 through July 2, 1990. The State argues that if HL & P's financial integrity was protected through July 2, 1990, by prior PUC rulings, its financial integrity for any earlier period cannot be relitigated in this proceeding.

It is the premise of the State's argument that is at fault. The PUC previously ruled that deferred accounting treatment of Unit 1 costs was *necessary* to ensure HL & P's financial integrity, not that it was *sufficient*. As the court of appeals correctly held, there is no conflict in finding that like treatment of Unit 2 costs was also necessary during an overlapping period. 884 S.W.2d at 549–550.

### B

■ In yet another part of Docket 8425 the PUC estimated HL & P's federal income tax expense without taking into account deductions for expenses paid by shareholders. The court of appeals reversed this portion of the PUC's order. *Id.* at 543–544. HL & P has appealed. After the court of appeals issued its opinion in this case we approved the PUC's similar treatment of tax expense in *Public Utility Commission v. GTE–Southwest, Inc.,* 901 S.W.2d 401, 411–412 (Tex. 1995). The court of appeals' disposition of

this issue conflicts with our decision in *GTE* and must accordingly be reversed.

\* \* \* \* \* \*

The judgment of the court of appeals is reversed to the extent it reverses the judgment of the district court, and modified to provide that the district court's judgment is affirmed in all respects. As thus modified, the judgment of the court of appeals is affirmed.