# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## ON REMAND

## NO. 03-17-00490-CV

**Texas Industrial Energy Consumers, Cities Advocating Reasonable Deregulation, and Office of Public Utility Counsel, Appellants**

**v.**

**Public Utility Commission of Texas and Southwestern Electric Power Company, Appellees**

### FROM THE 200TH DISTRICT COURT OF TRAVIS COUNTY
### NO. D-1-GV-14-000536, THE HONORABLE DARLENE BYRNE, JUDGE PRESIDING

### M E M O R A N D U M   O P I N I O N

This case involves an agency's interpretation of its prior administrative order. In 2014 the Public Utility Commission of Texas issued an order that, among other things, construed an earlier order the Commission had issued in 2008. Texas Industrial Energy Consumers (TIEC), Cities Advocating Reasonable Deregulation (CARD), and the Office of Public Utility Counsel filed suit in Travis County District Court for judicial review of the 2014 Order. Defendants were the Commission and Southwestern Electric Power Company (SWEPCO). The district court affirmed the Commission's Order. This Court reversed and remanded on the basis of a separate issue and did not address the Commission's interpretation of its 2008 Order. The Texas Supreme Court reversed this Court's judgment, affirmed the trial court's judgment as to

the issue we had addressed, and remanded the case to this Court to decide the issue we had not addressed. We will reverse the trial court's judgment and remand the case to the Commission for further proceedings.

**FACTUAL AND PROCEDURAL BACKGROUND**

This case had its genesis in 2007, when SWEPCO applied to the Commission for an amendment to its certificate of convenience and necessity (CCN) to allow it to construct a new coal-fired power plant called the Turk Plant.[1] That proceeding was given PUC Docket No. 33891. In 2008, after a lengthy hearing before the State Office of Administrative Hearings (SOAH), the Commission granted SWEPCO's application but imposed significant conditions and limitations.

The Commission's 2008 Order in Docket No. 33891 conditionally granted SWEPCO's application but placed a cap on the amount of "capital costs" that SWEPCO would later be able to include in its rate base:

> [T]he Commission conditionally grants the CCN for SWEPCO's ownership in the 600 MW Turk Plant on obtaining all of the necessary environmental permits, limits the costs that may be included in ratebase to Texas's jurisdictional allocation of SWEPCO's ownership share of total plant cost of $1.522 billion,[2] and places other limitations and requirements on SWEPCO.
>
> . . . .

---

[1] For policy reasons related to retail competition among providers of electricity, SWEPCO is still subject to traditional cost-of-service rate regulation. *See* Tex. Util. Code § 39.501.

[2] At that time SWEPCO was scheduled to own (and ultimately did end up owning) about 73.3% of the Turk Plant. Because the plant also provides electricity for parts of Louisiana and Arkansas, Texas's "jurisdictional allocation" for plant production is 32.7% of SWEPCO's 73.3%, or approximately $365 million.

2

The cap on the capital costs that Texas retail consumers may be responsible for is the Texas jurisdictional allocation of $1.522 billion.

Following completion of the Turk Plant in 2012, SWEPCO applied to the Commission for permission to change its rates to earn a return on its capital investment in the plant. SWEPCO's application was challenged before the Commission by TIEC, CARD, and others, primarily on the ground that during construction SWEPCO had not properly monitored the economic prudence of completing the project. The final Order in that proceeding, to which the Commission assigned Docket No. 40443, is the subject of this appeal.

After another lengthy hearing before SOAH, the Commission found in Docket No. 40443 that SWEPCO had met its burden of proving that completing the Turk Plant was prudent. In addition, although the issue had not been briefed by the parties, the Commission determined initially that the amount of SWEPCO's construction financing costs, referred to as "allowance for funds used during construction" (AFUDC), was meant to be included in the capital-costs cap imposed by the 2008 Order in Docket No. 33891. On rehearing, however, the Commission reopened the record and admitted additional evidence regarding the capital-costs-cap issue. A majority of the commissioners found that the 2008 Order was

> ambiguous and not conclusive regarding whether the Commission at that time intended to include AFUDC in the $1.522 billion cap on capital costs. Therefore, the Commission looks beyond the order in Docket No. 33891 to the underlying record evidence in that docket.

Subsequently, two of the commissioners reversed their earlier decision and found that AFUDC was not included in the cap:[3]

---

[3] The third commissioner, the only one who had been on the Commission when the 2008 Order was issued, dissented.

> In [looking to the underlying record evidence], the Commission finds that the cap was based on estimates of construction costs excluding AFUDC as testified to by parties to that docket. Based on that evidence, the Commission now concludes that the AFUDC was a separately calculated component of capital costs that was not intended to be included in the cap. Accordingly, the Commission determines that the order in Docket No. 33891 did not include AFUDC in the cap on capital costs, and that SWEPCO may recover the Texas jurisdictional share of those costs from ratepayers.

On this basis, the Commission allowed SWEPCO to include AFUDC separately in its rate base, which amounted to approximately $250 million more than would have been allowed if the cap on capital costs had been construed to include AFUDC.

TIEC, CARD, and others filed a suit for judicial review to challenge this Order on both the prudence issue and the capital-costs-cap issue. The trial court affirmed. On further appeal, this Court reversed the Commission's Order based on our holding that SWEPCO had not met the standard the Commission purported to apply, thereby rendering the Commission's decision arbitrary and capricious. *See Texas Indus. Energy Consumers v. Public Util. Comm'n*, 608 S.W.3d 817, 829 (Tex. App.—Austin 2018), *rev'd*, 620 S.W.3d 418 (Tex. 2021). Because that decision resulted in a complete reversal of the Commission's Order, this Court did not address the costs-cap issue. *Id.* at 829 n.14. On further appeal, the Texas Supreme Court reversed this Court's judgment, holding that the Commission's prudence decision was supported by substantial evidence. *See Public Util. Comm'n v. Texas Indus. Energy Consumers*, 620 S.W.3d 418, 432 (Tex. 2021). The supreme court remanded the case to this Court for consideration of the costs-cap issue. *Id.*

## DISCUSSION

The single narrow issue remaining for decision here is whether the cap on "capital costs" in the Commission's 2008 Order in Docket No. 33891 was intended to include AFUDC.

4

This required the Commission, in the 2014 proceeding, to interpret its 2008 Order. The Commission's 2014 Order in Docket No. 40443 concluded on rehearing that the cap in the 2008 Order did not include AFUDC. TIEC and CARD complain that the 2014 Order was erroneous because the 2008 cap unambiguously included AFUDC.[4] SWEPCO and the Commission argue that the Commission's 2014 Order was correct, both in concluding that the 2008 Order was ambiguous and in concluding that the capital-costs cap in that Order did not include AFUDC.

### Rules of Interpretation

Courts and agencies are required to interpret earlier agency orders using the same rules that are used to construe statutes. *See, e.g.*, *L & G Oil Co. v. R.R. Comm'n*, 368 S.W.2d 187, 193 (Tex. 1963) ("Rules and orders of the Railroad Commission made under authority of a statute are considered under the same principles as if they were the acts of the Legislature . . . ."); *Office of Pub. Util. Couns. v. Texas-New Mexico Power Co.*, 344 S.W.3d 446, 450–51 (Tex. App.—Austin 2011, pet. denied) ("In construing orders of an administrative agency, we apply the same rules as when we interpret statutes."); *Boswell v. Brazos Elec. Power Co-op., Inc.*, 910 S.W.2d 593, 599 (Tex. App.—Fort Worth 1995, writ denied) ("Rules of statutory construction apply equally to the construction of an administrative order."); *Airport Coach Serv., Inc. v. City of Fort Worth*, 518 S.W.2d 566, 574 (Tex. Civ. App.—Tyler 1974, writ ref'd n.r.e.) ("The same rules apply to the construction of [an] order of an administrative agency as those applied to the construction of statutes.").

The construction of a statute is a question of law that courts review de novo. *Texas Lottery Comm'n v. First State Bank of DeQueen*, 325 S.W.3d 628, 635 (Tex. 2010); *see*

---

[4] The Office of Public Utility Counsel appealed the Commission's 2014 Order to this Court but did not challenge the costs-cap portion of the Order.

*also Davis v. Morath*, 624 S.W.3d 215, 221 (Tex. 2021) ("[T]he jurisdictional question presented here turns on the meaning of a statute and thus presents a question of law reviewed de novo."). Accordingly, the construction of a prior agency order is likewise a question of law that is reviewed de novo. *See Boswell*, 910 S.W.2d at 599; *Airport Coach Serv.*, 518 S.W.2d at 574.

The Texas Supreme Court has set forth the rules of statutory interpretation on numerous occasions. The legislature's intent must, if possible, be discovered within the language the legislature enacted. *Texas Health Presbyterian Hosp. of Denton v. D.A.*, 569 S.W.3d 126, 135-36 (Tex. 2018). When text is clear and unambiguous, it is determinative of intent. *TIC Energy & Chem., Inc. v. Martin*, 498 S.W.3d 68, 74–75 (Tex. 2016). If the statute's words are unambiguous, that ends the inquiry. *Agar Corp., Inc. v. Electro Cirs. Int'l, LLC*, 580 S.W.3d 136, 147 (Tex. 2019). Courts must construe a statute as a whole. *Youngkin v. Hines*, 546 S.W.3d 675, 680 (Tex. 2018) ("[L]egislative intent derives from an act as a whole rather than from isolated portions of it.").

Courts may not rely on extrinsic aids to construe statutory language unless the language is ambiguous. *Texas Health Presbyterian Hosp.*, 569 S.W.3d at 135. Nor may extrinsic aids to interpretation be used to *create* an ambiguity. *Id.* at 133 n.8.

Moreover, "we look to and rely on the plain meaning of a statute's words as expressing legislative intent unless a different meaning is supplied, is apparent from the context, or the plain meaning of the words leads to absurd or nonsensical results." *El Paso Educ. Initiative, Inc. v. Amex Props, LLC*, 602 S.W.3d 521, 531 n.50 (Tex. 2020) (quoting *Cadena Comercial USA Corp. v. Texas Alcoholic Beverage Comm'n*, 518 S.W.3d 318, 325 (Tex. 2017)).

The interpretation must come from the words that were used, not from language that someone later says should have been used:

6

> Construing clear and unambiguous statutes according to the language actually enacted and published as law—instead of according to statements that did not pass through the law-making processes, were not enacted, and are not published as law—ensures that ordinary citizens are able to rely on the language of a statute to mean what it says.

*Molinet v. Kimbrell*, 356 S.W.3d 407, 414 (Tex. 2011); *see also Texas Health Presbyterian Hosp.*, 569 S.W.3d at 137 ("Ultimately, our responsibility is to construe the language the legislature enacted, not to determine what the legislature or any individual legislators may have meant to enact.").

Because these same rules of statutory interpretation also apply to the interpretation of an agency order, the Commission's intent in the 2008 Order must, if possible, be discovered within the language of the Order itself. "It matters not what someone thinks the [Order] may have meant to say or now hopes or wishes it said." *Entergy Gulf States, Inc. v. Summers*, 282 S.W.3d 433, 445 (Tex. 2009) (Hecht, J., concurring).

SWEPCO argues that the Commission's interpretation of the 2008 Order is entitled to deference. But an agency's interpretation of a statute is given deference or "serious consideration" by the courts only when the statute is ambiguous. *Combs v. Health Care Servs. Corp.*, 401 S.W.3d 623, 630 (Tex. 2013) ("It is true that courts grant deference to an agency's reasonable interpretation of a statute, but a precondition to agency deference is ambiguity . . . ."); *see also Davis*, 624 S.W.3d at 222 ("[S]tatutory ambiguity is a precondition to any such 'serious consideration.'"). Accordingly, the same rule applies to the interpretation of an agency order: deference is given only when the order being interpreted is ambiguous.

In Docket No. 40443 the Commission found that the 2008 Order was ambiguous regarding the question of whether the cap on capital costs included AFUDC. In interpreting the

7

2008 Order, however, including its determination that the Order was ambiguous, the Commission in Docket No. 40443 considered and placed great weight on factors outside the words of the Order. Concluding that the 2008 Order was ambiguous, the 2014 Order expressly stated that the Commission "looks beyond the order in Docket No. 33891 to the underlying record evidence in that docket."

The question of whether ambiguity exists is a question of law that is reviewed de novo. *URI, Inc. v. Kleberg County*, 543 S.W.3d 755, 763 (Tex. 2018).

SWEPCO argues that we should interpret the 2008 Order "in light of surrounding circumstances," including the testimony presented when the Commissioners in Docket No. 40443 reopened the evidence and heard testimony about what various individuals believed the 2008 Order meant. In this regard, SWEPCO urges us to follow *Public Utility Commission v. Houston Lighting & Power Co.*, 645 S.W.2d 645 (Tex. App.—Austin 1983, writ ref'd n.r.e.), in which this Court stated that "if we read the Commission's order as though it were a statute, as we must, we are permitted to take into account the circumstances surrounding its enactment. *C.f.* Tex. Rev. Civ. Stat. Ann. art. 5429b–2, § 3.03(2) (Supp. 1982)." *Id.* at 646-47. The authority cited for the quoted statement was the predecessor to the Code Construction Act, now found at section 311.023 of the Texas Government Code. But in the intervening 38 years since the *HL&P* opinion was issued, the supreme court has made it crystal clear that, notwithstanding section 311.023, courts may not use extrinsic interpretation aids in the absence of ambiguity:

> Constitutionally, it is the courts' responsibility to construe statutes, not the legislature's. In fulfilling that duty, we do not consider legislative history or other extrinsic aides [sic] to interpret an unambiguous statute because the statute's plain language most reliably reveals the legislature's intent. We have therefore "repeatedly branded" reliance on extrinsic aids as "'improper' and 'inappropriate' when statutory language is clear."

8

*Texas Health Presbyterian Hosp.*, 569 S.W.3d at 136 (footnotes and citations omitted). We therefore decline to follow the quoted statement from the *HL&P* opinion.

Like legislative intent, the intent of the Commission in its 2008 Order must be determined from the words of the Order alone, if possible. Only if the Order is ambiguous may we consider outside factors. Thus, the inquiry into whether the Order is ambiguous is a threshold question of law that must be decided before outside factors, including extrinsic aids to interpretation, may be considered. In that inquiry, therefore, we look solely to the words of the Order.

Thus, in making the threshold determination of whether the 2008 Order is ambiguous regarding whether the cap on capital costs was intended to include AFUDC, we may consider neither the circumstances surrounding its issuance nor other extrinsic aids to interpretation. This means we may not consider the discussions the Commissioners may have had before its issuance or the testimony of witnesses at either the 2008 hearing or the 2014 hearing. The threshold question is whether, looking solely at its words, the 2008 Order is ambiguous as to the capital-costs issue. Only if it is may we then consider extrinsic aids to interpretation or other outside factors.

### The 2008 Order

Because the words in the 2008 Order are the basis on which we decide the question of ambiguity, we quote the relevant portions of the Order at length:[5]

**Order**

. . . .

_____

[5] Footnotes in the Order have been omitted.

. . . . [T]he Commission conditionally approves SWEPCO's application as modified by and subject to the limitations contained in this Order.

. . . .

## II. Discussion

. . . .

### A. Wholesale Loads
### B.

. . . .

. . . . While the Commission determines that the need for the plant has been established, *the finding of need is not made at any cost*. Therefore, the Commission conditionally grants the CCN for SWEPCO's ownership in the 600 MW Turk Plant on obtaining all of the necessary environmental permits, *limits the costs that may be included in ratebase to Texas's jurisdictional allocation of SWEPCO's ownership share of total plant cost of $1.522 billion*, and places other limitations and requirements on SWEPCO.

. . . .

### C. Conditional Approval

. . . . [A]s discussed below, the uncertainties surrounding the cost of this plant are a significant consideration in the Commission's approval. Because these uncertainties can only increase as one moves out further in time, the Commission concludes that is appropriate and necessary to place further limitations on SWEPCO.

. . . .

### C. Limitations

. . . .

. . . . [T]he Commission finds that SWEPCO's plan to build the Turk Plant is the most reasonable approach to meeting the identified future power needs *given the current estimates for costs*. *If the projected costs for building and operating this plant were higher, the Commission would be unlikely to find that the plant would provide the necessary benefits to consumers* and would be likely to find that building the plant would place undue risks to the financial standing of the company.

The Commission also recognizes the risks and uncertainties regarding the costs that will be incurred in building and operating the Turk Plant,

10

notwithstanding the amount of costs currently locked-in by contract. Accordingly, *it is appropriate to place certain limits on the costs that may be placed into base rates as part of the Commission's approval of SWEPCO's CCN amendment.*

**1. Capital Costs**

The estimated cost of the Turk Plant, with September 2008 as the anticipated start of construction, is $1.522 billion. The Commission determines that *it is unreasonable to expect Texas retail consumers to be responsible for the Texas jurisdictional allocation of any additional costs that exceed $1.522 billion. This cap on the capital costs of the Turk Plant limits the financial risk to Texas ratepayers* arising out of uncertainties identified in the testimony including, but not limited to, the following: increased material and labor costs because of delays; costs as a result of changes in certification or approval of the Turk Plant by other jurisdictions; changes in the currently proposed ownership participation; and additional costs of plant construction, including those associated with the use of ultra-supercritical technology.

. . . .

## III. Findings of Fact

. . . .

22. The capital cost of the Turk Plant is estimated to be $1.522 billion.

. . . .

38. The $1.522 billion investment in the Turk Plant and related transmission facilities would have a significant impact on SWEPCO's financial integrity.
39. The cost of the Turk Plant, including associated transmission and Allowance for Funds Used During Construction (AFUDC), would constitute an increase to SWEPCO's total assets of approximately 46% and an increase to rate base of approximately 98%.
40. SWEPCO will use short-term borrowings, long-term debt, retained earnings through dividend reductions, and equity contributions from SWEPCO's parent, AEP, to finance the construction costs.
41. SWEPCO also plans to request recovery of carrying costs on Construction Work in Progress (CWIP) during construction.

. . . .

54. SWEPCO's initial cost estimate of $1.347 billion for the Turk Plant was low because of construction delays. The estimate was updated to be $1.522 billion as of August 31, 2008.

11

. . . .

**V. Ordering Paragraphs**

. . . .

2. *The cap on the capital costs that Texas retail consumers may be responsible for is the Texas jurisdictional allocation of $1.522 billion. This limits the financial risk to Texas ratepayers* arising out of uncertainties identified in the testimony including, but not limited to, the following: increased material and labor costs due to delays; costs as a result of changes in certification or approval of the Turk Plant by other jurisdictions; changes in the currently proposed ownership participation; and additional costs of plant construction, including those associated with the use of ultra-supercritical technology.

(All emphases added except for the phrase "*given the current estimates for costs*.")

All parties agree that the 2008 Order intended to place a cap on the amount of "capital costs" that could later be included in SWEPCO's rate base to earn a return from Texas ratepayers. But the Order does not define "capital costs." In this circumstance, we give the words their ordinary meaning, *Smith v. Clary Corp.*, 917 S.W.2d 796, 799 (Tex. 1996), "unless a more precise definition is apparent from the statutory context or the plain meaning yields an absurd result," *Fort Worth Transp. Auth. v. Rodriguez*, 547 S.W.3d 830, 838 (Tex. 2018).

In deciding whether the ordinary meaning of "capital costs" unambiguously includes AFUDC, it is helpful to delve more deeply into the use of those terms and others, as well as to examine some basic concepts of utility accounting. We are assisted in that effort by recent opinions of the Texas Supreme Court.

*Ratemaking principles*

The rates that a public utility charges the public are governed by the Public Utility Regulatory Act (PURA), which is Title 2 of the Texas Utilities Code. In general, the purpose of

12

the Act is "to assure rates, operations, and services that are just and reasonable to the consumers and to the electric utilities." Tex. Util. Code § 31.001(a); *see also id.* § 36.003(a) ("The regulatory authority shall ensure that each rate an electric utility or two or more electric utilities jointly make, demand, or receive is just and reasonable."). To that end, a utility's rates are based on (1) a reimbursement of expenses and (2) a return on invested capital:

> [A] utility's rates must be set so as to produce revenues equal to the sum of two amounts. One is the utility's "reasonable and necessary operating expenses", including taxes and depreciation. The other is "a reasonable return on its invested capital used and useful in rendering service to the public." That capital is the utility's rate base. Thus, a utility is entitled to rates sufficient to repay its expenses, without a return or profit on those expenses, and to provide a return on the invested capital included in its rate base, without repaying that investment.

*Public Util. Comm'n v. Texas Indus. Energy Consumers*, 620 S.W.3d 418, 422 n.6 (Tex. 2021) (quoting *Cities for Fair Util. Rates v. Public Util. Comm'n*, 924 S.W.2d 933, 936 (Tex. 1996)).

The Commission is required by statute to allow a utility "a reasonable opportunity to earn a reasonable rate of return":

> In establishing an electric utility's rates, the regulatory authority shall establish the utility's overall revenues at an amount that will permit the utility a reasonable opportunity to earn a reasonable return on the utility's invested capital used and useful in providing service to the public in excess of the utility's reasonable and necessary operating expenses.

Tex. Util. Code § 36.051. The Commission's rules echo this requirement:

> (c) Return on invested capital. The return on invested capital is the rate of return times invested capital.
> > (1) Rate of return. The commission shall allow each electric utility a reasonable opportunity to earn a reasonable rate of return, which is expressed as a percentage of invested capital . . . .

13

16 Tex. Admin. Code § 25.231(c)(1) (Pub. Util. Comm'n of Tex., Cost of Service). Thus, the "rate of return" set by the Commission multiplied by the amount of invested capital produces the return on a utility's invested capital.

### Operating Expenses

The determination of a utility's operating expenses begins with gathering data from a historical "test year":

> To establish the utility's reasonable and necessary operating expenses, the Commission starts with the utility's actual expenses incurred during a "test year" and then adjusts those expenses for known and measurable changes. 16 Tex. Admin. Code § 25.231(b) (2014) (Pub. Util. Comm'n of Tex., Cost of Service). Allowable expenses include such things as operating expenses, federal income taxes, and employee post-retirement benefits.

*State of Texas' Agencies & Insts. of Higher Learning v. Public Util. Comm'n*, 450 S.W.3d 615, 622 (Tex. App.—Austin 2014), *aff'd in part, rev'd in part on other grounds sub nom. Oncor Elec. Delivery Co. v. Public Util. Comm'n*, 507 S.W.3d 706 (Tex. 2017); *see also Reliant Energy, Inc. v. Public Util. Comm'n*, 153 S.W.3d 174, 183 (Tex. App.—Austin 2004, pet. denied).

The Commission's relevant rule provides in part:

> Allowable expenses. Only those expenses which are reasonable and necessary to provide service to the public shall be included in allowable expenses. In computing an electric utility's allowable expenses, only the electric utility's historical test year expenses as adjusted for known and measurable changes will be considered . . . .

16 Tex. Admin. Code § 25.231(b). PURA defines "test year" to mean "the most recent 12 months, beginning on the first day of a calendar or fiscal year quarter, for which operating data for a public utility are available." Tex. Util. Code § 11.003(20).

14

*Invested Capital*

Section 36.051 of PURA provides that a utility is permitted to earn a return only on its "invested capital":

> In establishing an electric utility's rates, the regulatory authority shall establish the utility's overall revenues at an amount that will permit the utility a reasonable opportunity to earn *a reasonable return on the utility's invested capital* used and useful in providing service to the public in excess of the utility's reasonable and necessary operating expenses.

*Id.* § 36.051 (emphasis added).

Section 36.053 of PURA, titled "Components of Invested Capital," provides:

> (a) Electric utility rates shall be based on the original cost, less depreciation, of property used by and useful to the utility in providing service.

> (b) The original cost of property shall be determined at the time the property is dedicated to public use, whether by the utility that is the present owner or by a predecessor.

*Id.* § 36.053(a), (b). Thus, "invested capital" consists primarily of the cost of plant, property, and equipment: "The rate base, sometimes referred to as invested capital, includes as a major component the original cost of plant, property, and equipment, less accumulated depreciation, used and useful in rendering service to the public." *Texas Indus. Energy Consumers*, 620 S.W.3d at 422 n.6 (quoting 16 Tex. Admin. Code § 25.231(c)(2)).

> A utility's cost of constructing a facility for use in providing service is ordinarily not an operating expense; obviously, until the facility is completed, there is nothing to operate. Rather, the cost of constructing a new facility, like the purchase price of an existing facility, is an investment of capital in an asset to be used in the future. As such, it must be included in a utility's rate base, but not until the facility has become "used and useful in rendering service to the public."

*Cities for Fair Util. Rates*, 924 S.W.2d at 935.

15

As stated by the authorities cited above, in the ordinary circumstance "construction costs are not included in rate base until construction is complete. Meanwhile, they are accrued in an account for construction work in progress, or CWIP, for short." *Id.* Only in extraordinary circumstances may CWIP be included in a utility's rate base before construction is complete:

> [I]f costs of capital and construction are high, and construction periods are lengthy, the funds "advanced"—actually expended by a utility—can be so large over so long a time that they cause the utility serious cash flow problems. Expenditures may become enormous before any return at all is realized. . . . To accommodate a utility's real financial difficulties, and still preserve an accounting procedure historically viewed as fair to present and future utility customers, regulators began to allow CWIP to be included in the rate base before completion of construction, but only when it was necessary for the financial integrity of the utility.

*Id.* at 936. This standard is reflected in PURA:

> Construction work in progress, at cost as recorded on the electric utility's books, may be included in the utility's rate base. The inclusion of construction work in progress is an exceptional form of rate relief that the regulatory authority may grant only if the utility demonstrates that inclusion is necessary to the utility's financial integrity.

Tex. Util. Code § 36.054(a).

The cost of constructing a new plant includes financing costs, i.e., the interest on money borrowed or used by the utility for construction of the plant. This is referred to as "allowance for funds used during construction," or AFUDC:

> The cost of the capital used to pay construction costs is also part of the investment in the facility. Recognizing this, uniform accounting rules adopted by the Federal Power Commission in 1937 and followed in most states allowed a utility to include in its cost accounting an amount for "interest during construction." In 1971 the FPC substituted the phrase "allowance for funds

16

used during construction," or AFUDC, for interest, but the basic idea remained the same. AFUDC is now part of FERC's uniform accounting system. While construction is continuing, AFUDC accrues on CWIP. AFUDC does not represent a transfer of funds; it is simply an entry in a utility's books to indicate the cost of capital used during construction.

*Cities for Fair Util. Rates*, 924 S.W.2d at 935 (citations omitted). Thus, "AFUDC refers to the 'carrying costs' used to finance a long-term construction project." *Texas Indus. Energy Consumers*, 620 S.W.3d at 422 n.5.

Like CWIP, AFUDC is normally accrued during construction and then added to the utility's rate base after construction is complete and the new plant becomes "used and useful": "When construction is complete and the facility operational, both CWIP and AFUDC are transferred to the utility's rate base, and the utility begins to earn a return on its investment in both." *Cities for Fair Util. Rates*, 924 S.W.2d at 935-36.

As described by Professor Bonbright, "[t]he primary purpose of AFUDC is to capitalize the costs of financing construction, separate the effects of the construction program from current operations, and to allocate current capital costs to future periods when these capital facilities are producing revenue." James C. Bonbright, et al., *Principles of Public Utility Rates* 242 (2d ed. 1988).

From these authorities it is beyond dispute that AFUDC is part of the capital cost of plant construction. Indeed, even SWEPCO concedes in its brief that "[i]t is true that AFUDC is typically treated as a cost to be capitalized and included in rate base." SWEPCO attempts to get around this fact by arguing that we should go behind the words of the 2008 Order to find its true meaning. That we may not do, however, in the absence of ambiguity.

17

In its brief, SWEPCO offers this interesting analogy: a speaker who uses the term "animal" may not be intending to include dogs within that term, as could be discerned from background information. That may be true as far as it goes, but applying the rules of interpretation set forth above would allow us to reach that conclusion only if the text of the statute or order itself so indicated. If, for example, a statute prohibited "animals" from restaurants, but other parts of the statute implied that the use of the term "animals" in the relevant statutory provision was intended to refer only to pigs and cows, then the term "animals" could well be considered ambiguous, which would then allow consideration of outside factors, including extrinsic aids to interpretation. By itself, however, the term "animals" is not ambiguous. So if our hypothetical statute did nothing more than prohibit "animals" from restaurants, there would be no ambiguity. Standing alone, the term "animals" unambiguously includes dogs. The result would be the same even if there were evidence that preliminary testimony or discussions among legislators seemed to revolve only around pigs and cows, because in determining whether the statutory term "animals" was ambiguous we would be permitted to consider only the words of the statute. That is the situation here.

### *Construing the 2008 Order as a Whole*

SWEPCO argues that the 2008 Order itself, construed as a whole, shows that the Commission did not intend for the cap on "capital costs" to include AFUDC. The portions of the Order on which SWEPCO relies include the following:

1. SWEPCO argues that the 2008 Order did not expressly state that the cap on capital costs was to include AFUDC. Although this is true, neither did the cap expressly exclude it. And since AFUDC is a recognized element of capital costs or capital investment, the absence

18

of express mention does not show an intent to exclude it. This portion of the Order does not support ambiguity.

2. SWEPCO also argues that the Commission sometimes uses "capital costs" to refer only to "direct construction costs" separate and apart from AFUDC. While SWEPCO offers several examples in which the Commission has previously used "capital cost" in a way that did not include AFUDC, in each instance the Commission was careful to explain that the "capital cost" figure it was using was "excluding AFUDC." If "capital cost" did not ordinarily include AFUDC, there would be no reason for the Commission to expressly note its exclusion. Rather than supporting SWEPCO's position, these examples demonstrate that when the Commission intends for its use of the term "capital costs" *not* to include AFUDC, it so states. This portion of the Order does not support ambiguity.

3. SWEPCO also argues that the $1.522 billion cost estimate on which the cap was based did not itself include AFUDC, much the way a residential homebuilder "provides to the prospective owner an estimate of the cost to build that home or pool, but not an estimate of the prospective owner's financing costs." There are at least three difficulties with this argument. First, SWEPCO's assertion that the $1.522 billion cost estimate did not include AFUDC apparently is derived primarily from testimony at the 2008 and 2014 hearings, which we may not consider. Second, there is no indication in the 2008 Order itself that the $1.522 billion cost estimate on which the cap was based did not include AFUDC. SWEPCO asserts that this number is an estimate of *direct construction costs*—i.e., excluding AFUDC—but the Order itself does not support that narrow reading. Finding of Fact 22 of the Order, for example, simply states that "[t]he capital cost of the Turk Plant is estimated to be $1.522 billion." Other parts of the Order are similarly general in nature: "total plant cost of $1.522 billion," "[t]he estimated cost of

19

the Turk Plant . . . is $1.522 billion," "SWEPCO's initial cost estimate . . . was updated to be $1.522 billion," and "[t]he cap on the capital costs that Texas retail consumers may be responsible for is the Texas jurisdictional allocation of $1.522 billion." As the supreme court has stated, "AFUDC is as much a part of a utility's capital investment in a facility as construction costs." *Cities for Fair Util. Rates*, 924 S.W.2d at 942. Accordingly, it cannot be assumed that the Commission meant by the foregoing general language to exclude AFUDC. Third, the 2008 Order repeatedly voiced the Commission's concern regarding the amount of capital investment that could ultimately be included in SWEPCO's rate base and thereafter earn a return from Texas ratepayers. Thus, the 2008 Order implemented the Commission's intent to limit the amount of capital investment that could end up being included in SWEPCO's rate base: "[I]t is appropriate to place certain *limits on the costs that may be placed into base rates* as part of the Commission's approval of SWEPCO's CCN amendment." (Emphasis added.) The Commission is, of course, well aware that AFUDC goes into a utility's rate base just the same as "direct construction costs." The Commissioners' concern being the amount that would be included in SWEPCO's rate base, it is illogical that the Commission would want to put a cap on only *one* type of capital cost. On the contrary, it is reasonable to conclude that the Commission intended for the cap to be on "*any* additional cost" that would be put into SWEPCO's rate base. That would include AFUDC. Because none of the referenced portions of the Order states or implies that AFUDC is to be excluded from the cap, they do not support a conclusion that the Order is ambiguous.

4. SWEPCO next points to the Commission's statement in the 2008 Order that SWEPCO's plan to build the Turk Plant "is the most reasonable approach to meeting the identified future power needs *given the current estimates for costs*." (Emphasis in the 2008 Order.) SWEPCO argues that the Commission's emphasis of the last phrase of this statement

20

shows that the cap was intended to apply only to "direct construction costs." We disagree. Since AFUDC is part of the capital cost of building a new plant, the term "costs" would more logically be intended to include AFUDC than to exclude it. In any event, even if the $1.522 billion estimate of "current costs" was based only on direct construction costs (which is not shown in the 2008 Order), the cap appears to have been intended to have a broader impact. The Commission's concern about the impact of the plant's eventual cost on ratepayers supports the conclusion that the Commissioners desired to put a cap on *all costs* that would go into SWEPCO's rate base. That would include AFUDC. This portion of the Order does not support ambiguity.

5. SWEPCO next argues that Finding of Fact 39, with its express reference to AFUDC, supports its position:

> 39. The cost of the Turk Plant, including associated transmission and Allowance for Funds Used During Construction (AFUDC) would constitute an increase to SWEPCO's total assets of approximately 46% and an increase to rate base of approximately 98%.

We see nothing in this language that indicates an intent that AFUDC was to be excluded from the cap on capital costs to be later included in SWEPCO's rate base. In any event, the reason this Finding expressly mentioned AFUDC as being within the costs of the Turk Plant may lie in the fact that other references in the Order to the cost of the plant were to the *overall* cost of building the plant whereas the subject of Finding of Fact 39 was the particular impact the capital investment would have on SWEPCO's assets and rate base. This portion of the Order does not support ambiguity.

21

6. Finally, SWEPCO argues that a comment by the dissenting Commissioner in 2008 supports its position. The Commissioner's comment was that the cap was a "$1.522 billion construction cost cap." Even if the dissenting Commissioner was not including AFUDC in her reference to "construction cost," however, the comment is not part of the Commission's 2008 Order and therefore is no evidence of the Order's meaning. This comment does not support ambiguity.

## CONCLUSION

We conclude first that the terms "invested capital" and "capital costs" are synonymous. They are two names for the same thing. Whichever term one chooses to use, it does not qualify as an operating expense and is ultimately to be included in a utility's rate base to earn a return. And only a capital "cost" or "investment" may be included in a utility's rate base. *See* Tex. Util. Code § 36.051.

Second, we conclude that AFUDC is unambiguously one component of "capital costs." If there could be any doubt about that, the Texas Supreme Court laid it to rest 25 years ago: "AFUDC is as much a part of a utility's capital investment in a facility as construction costs. AFUDC would be included in rate base on completion of construction, or on a showing of necessity for a utility's financial integrity." *Cities for Fair Util. Rates*, 924 S.W.2d at 942. Giving the phrase "capital costs" its ordinary meaning, the term includes AFUDC.

Third, looking solely at the words of the 2008 Order, we conclude that the cap on "capital costs" was unambiguously intended to include AFUDC. And within the context of the 2008 Order, we are unable to discern a "different or more precise definition apparent from the term's use," nor does assigning the term its ordinary meaning produce an absurd result.

22

Accordingly, we are not permitted to consider extrinsic aids to interpretation or other outside factors such as testimony and discussions that may have preceded the 2008 Order's issuance or the circumstances under which it was issued. In short, our determination that there is no ambiguity in the language of the Order "ends the inquiry." Therefore, we hold that the 2008 Order's cap on capital costs was intended to include AFUDC.

"Agencies are entitled to interpret their own orders, for administrative purposes, so long as the agency does not use the occasion to interpret as a means to amend the prior order." *Office of Pub. Util. Couns. v. Texas-New Mexico Power Co.*, 344 S.W.3d 446, 452 (Tex. App.—Austin 2011, pet. denied) (quoting *Cities of Abilene v. Public Util. Comm'n*, 146 S.W.3d 742, 747 n.7 (Tex. App.—Austin 2004, no pet.)). The effect of what the Commission did here was to amend the 2008 Order.

Pursuant to section 2001.174(2) of the Administrative Procedure Act, we reverse the judgment of the trial court and remand the case to the Public Utility Commission for further proceedings. *See* Tex. Gov't Code § 2001.174(2).

_____

J. Woodfin Jones

Before Justices Triana, Kelly, and Jones[*]

Reversed and Remanded on Remand

Filed: August 11, 2021

[*]Before J. Woodfin Jones, Chief Justice (Retired), Third Court of Appeals, sitting by assignment. *See* Tex. Gov't Code § 74.003(b).